NOT DESIGNATED FOR PUBLICATION

Nos. 121,748
121,749
121,750

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of A.B., M.B., and T.B.,
Minor Children.

MEMORANDUM OPINION

Appeal from Ellis District Court; BLAKE BITTEL, judge. Opinion filed May 1, 2020. Affirmed.

*J. Alex Herman*, of Herman Law Office, P.A., of Hays, for appellant.

*Charlene Brubaker*, assistant county attorney, for appellee.

Before STANDRIDGE, P.J., ATCHESON, J., and BURGESS, S.J.

PER CURIAM: Father appeals the district court's termination of his parental rights to his children, A.B., M.B., and T.B., and claims the evidence does not support the district court's finding that he was unfit for the foreseeable future. The district court terminated Father's parental rights on eight grounds, and each ground is supported by clear and convincing evidence. Because of the children's young ages and the 19 months Father had to complete reintegration tasks, the district court's finding that Father's conduct is unlikely to change in the foreseeable future is also supported by the evidence. The children have been doing well since being removed from the home, and the district court did not abuse its discretion when it found it was in the best interests of the children to terminate Father's parental rights. We affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

On December 29, 2017, the State filed a child in need of care (CINC) petition on behalf of A.B., M.B., and T.B. due to the parents' history of drug use, imprisonment, and homelessness. The same day, the district court placed the children in the protective custody of the Kansas Department for Children and Families (DCF). Father and Mother submitted a statement of no contest, and ultimately each child was found to be CINC. The district court ordered the children to remain in DCF custody, and the district court adopted a permanency plan with a goal of reintegration proposed by Saint Francis Community Services (SFCS). Based on the permanency plan, Mother and Father were given multiple case plan tasks. Additionally, per court order, Mother and Father were to stay drug and alcohol free and were required to submit three clean drug tests prior to visitation occurring.

The record is unclear concerning Father's criminal history. It appears that at the time the district court ordered the children to custody of DCF, Father was in jail but was released on January 16, 2018. After his release, Father was on post-release supervision but absconded in July 2018. An absconder warrant was issued on July 12, 2018, and Father was arrested on this warrant and domestic battery charges on August 28, 2018. Father remained in jail until March 1, 2019.

While Father was in jail, the district court changed the permanency goal from reintegration to adoption on September 21, 2018. After Father's release, on March 20, 2019, the district court ordered that "[v]isitation [was] not to occur until it can be done therapeutically or at a therapist's recommendation." This order was in response to the recommendation of the children's therapist who determined it was in the children's best interests to limit visitations with the parents. About one month later, on April 16, 2019, the State moved to terminate the parental rights of Mother and Father.

The district court held a termination hearing three months later, on July 25, 2019. Mother relinquished her parental rights before the court. Father did not relinquish his rights and the State presented the testimony of A.B.'s teacher, Father's probation officer, a DCF employee, multiple SFCS workers, and the children's foster parents. In addition to his own testimony, Father presented the testimony of his mother.

Ultimately, the district court found Father was unfit pursuant to K.S.A. 2019 Supp. 38-2269(b)(3), (b)(4), (b)(5), (b)(7), (b)(8), (b)(9), (c)(2), and (c)(3). The court found Father's conduct or condition that caused him to be unfit was unlikely to change in the foreseeable future and that termination of Father's parental rights was in the best interests of the three children.

Father timely filed this appeal.

DID THE DISTRICT COURT ERR IN TERMINATING FATHER'S PARENTAL RIGHTS?

A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the law considers this right to be fundamental. The State may therefore extinguish the legal bonds between parent and child only upon clear and convincing evidence of parental unfitness. K.S.A. 2019 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

As provided in K.S.A. 2019 Supp. 38-2269(a), the State must prove the parent to be unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination constitute parental unfitness. K.S.A. 2019 Supp. 38-2269(b). The statute

3

lists four other factors to be considered when a parent no longer has physical custody of a child. K.S.A. 2019 Supp. 38-2269(c).

In reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record considered in a light favoring the State as the prevailing party, that a rational fact-finder could have found that decision "highly probable, i.e., [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. Thus, this court resolves any conflicts in evidence to the State's benefit and against Father.

At the conclusion of the termination hearing, the district court found eight statutory factors which supported termination of Father's parental rights. Clear and convincing evidence of even a single statutory factor under K.S.A. 2019 Supp. 38-2269(b) or (c) is sufficient to serve as the basis for finding parental unfitness. See K.S.A. 2019 Supp. 38-2269(f). Each factor is analyzed below.

*There is clear and convincing evidence to support the district court's finding that Father's use of drugs was such as to render him unable to care for the ongoing needs of his children.*

A district court may terminate a parent's rights to his or her child if there is clear and convincing evidence of the "use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child." K.S.A. 2019 Supp. 38-2269(b)(3).

Father does not dispute his previous drug use. At the termination hearing, Father conceded that he "wasn't in the right state of mind" for the first 15 months of this case because of his drug use. Father blamed his failure to carry out case plan tasks on his

4

addiction. He testified that "[l]osing [his] kids while [he] was in jail really messed [his] head up" and "made [his] addiction that much worse." Despite his past actions, Father believed he had his addiction under control because he had been sober for a year. Father testified that he did not need treatment for his addiction because he had maintained his sobriety without it.

Father's position on his addiction was a significant concern for Father's SFCS caseworker. She testified that although Father has passed every drug test she had given him since his release from jail in March 2019, his addiction remained an issue he needed to address. The caseworker testified that Father's drug use was the reason the children were taken from his home initially and the reintegration of the children "would be a stress for him." The caseworker believed that for Father to be successful in reintegration, he would need to learn how to manage this stress without relapsing.

Father's probation officer, Kyle Bartling, also testified to Father's issues with addiction. Bartling testified that Father was initially charged with unlawful attempted possession of methamphetamine in February 2017 but ultimately pled guilty to attempted possession of marijuana. Father was initially given probation for this conviction, but it was revoked, and Father was ordered to serve his underlying five-month prison sentence. However, because Father completed his underlying sentence in county jail, he immediately began serving his postrelease supervision term with Bartling in January 2018. While on postrelease supervision, Father "did okay for the first couple months" but started using methamphetamine in June 2018 and tested positive for methamphetamine use on June 22, 2018. On July 2, 2018, Father completed an evaluation for substance abuse treatment and admitted at intake that he had been "regularly using methamphetamine." Following the intake, Father was advised to report for treatment but did not report on three occasions, which ultimately caused him to be discharged from treatment.

5

Bartling testified that Father never appeared to want to make any change in his lifestyle or behavior during the time he served as Father's probation officer. Bartling testified that "[t]here were moments" where he could tell Father "was really trying" to change his behavior but those moments were "short-lived." Bartling believed Father's methamphetamine was the cause of Father's problems.

Father testified that he had been sober for one year, but seven months of that year were spent incarcerated. Father had remained sober since being released, but he maintained that he did not need treatment and refused to go. Father was offered treatment while on supervised release but was discharged both times. Father was also aware that obtaining a substance abuse evaluation and subsequent treatment was a reintegration plan task but refused to go despite the efforts of SFCS. The State presented clear and convincing evidence of Father's use of methamphetamine as to render him unable to care for the ongoing physical, mental, or emotional needs of his children. See K.S.A. 2019 Supp. 38-2269(b)(3).

*There is clear and convincing evidence to support the district court's finding that the children suffered physical, mental, or emotional abuse or neglect.*

A district court may terminate a parent's rights to his or her child if there is clear and convincing evidence of the "physical, mental or emotional abuse or neglect or sexual abuse of a child." K.S.A. 2019 Supp. 38-2269(b)(4). Here, the district court held that there was no testimony "regarding what people would view as typical abuse," but there was testimony that the children observed abuse in the home. Additionally, the district court found that Father neglected the children due to his "total lack of visitation or contact at any time" since Father's visitation in April 2018. The evidence supports the district court's finding.

6

Father was arrested and charged with domestic battery twice. Both alleged victims are the mothers of Father's children. Father pled guilty to disorderly conduct, in lieu of the domestic battery of Mother, and was ordered to attend a Batterers Intervention Program. However, Father never entered the program.

Additionally, the children's foster mother testified that two of the children expressed witnessing violence in their home with Father. A.B. told her foster mother that her natural parents used to physically fight, and M.B. told her that "his mom had hit his dad or something like that." The foster father testified that after the children entered their care, "[a]nytime you would make [a] sudden move around [M.B.], he would kind of flinch a little bit." The foster father also testified that "for the first three months, [T.B.] just wanted to choke people." T.B. would try to choke his foster father and his siblings.

The record also supports the district court's finding that "[e]ssentially, the parents were completely absent from the children's lives." Father only had three visits with his children during the pendency of this case. The first two visits were in March 2018 and the third visit was in April 2018. These visits were soon after the children were placed in custody of DCF but resulted in the children not seeing Father for the remainder of their lives. Father's caseworker testified that Father had those visits but then "stopped participating with Saint Francis." Father stated that his addiction was the cause of his failure to participate in these cases; however, Father stopped visitations with his children over two months before he began using methamphetamine again. The record shows that Father's last visit was on April 2, 2018, but he did not test positive for methamphetamine until June 22, 2018. SFCS reported that it tried to set up visitations with Father after April 2, 2018, but it "struggle[d] to communicate" with Father to organize visitations.

Clear and convincing evidence supports the district court's finding that the children observed violence between the natural parents and that Father neglected the children when he stopped visitations only four months into these proceedings. Although

there was a barrier to visitation toward the end of the proceedings, Father stopped visitations before this barrier was in place. It was proper for the district court to find that there was physical, mental, or emotional abuse or neglect of the children. K.S.A. 2019 Supp. 38-2269(b)(4).

*There is clear and convincing evidence to support the district court's finding that reasonable efforts made by appropriate public or private agencies to rehabilitate the family failed.*

A district court may terminate a parent's rights to his or her child if there is clear and convincing evidence of the "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." K.S.A. 2019 Supp. 38-2269(b)(7). In this case, public agencies made efforts to rehabilitate the family in multiple ways.

DCF first received a report concerning the family on March 23, 2017. About a month after receiving the initial report, DCF spoke with the family regarding its situation and what the family could do to remedy the problem. DCF met with the family a second time, on May 4, 2017, and informed the family that "due to the concerns that were in the home, [DCF] would need to get some Family Preservation services involved, or [DCF] would be forced to talk to the court about the situation." On July 5, 2017, DCF met with the family, and it agreed to comply and participate with services. DCF sent a referral to SFCS two days later, and a family support worker at SFCS met with the family. At the meeting, SFCS explained the services it provided and explained that the services were free. At the initial meeting, the family told SFCS that it was unsure if it wanted SFCS services and Father was "very upset" that DCF referred the family to SFCS. The family was disgruntled and believed it was doing fine and did not need SFCS assistance. A few weeks later, SFCS presented the family with a case plan, it reviewed the plan, and then the family refused all services.

8

Five months later, the State got involved and filed the CINC petitions. After ordering DCF custody of the children, SFCS was tasked with developing a permanency plan for the children with the goal of reintegration. However, the efforts of SFCS to reintegrate the family also failed. Over the pendency of this case, there were four case plan meetings and Father did not attend any of them. According to his SFCS caseworker, Father refused to work with SFCS and that is why he quit visitations with the children. His caseworker also testified that since his release from incarceration in March 2019, Father would respond to SFCS if it reached out to him, but he would not initiate conversations with SFCS. Similarly, Father did not complete any case plan tasks until after the permanency goal was changed to adoption and Father was released from incarceration in March 2019.

DCF and SFCS both attempted to rehabilitate the family before involving the court. After the children were adjudicated CINC, SFCS attempted to rehabilitate the family for 19 months before Father's parental rights were terminated. The State presented clear and convincing evidence of the efforts provided by DCF and SFCS to rehabilitate the family. See K.S.A. 2019 Supp. 38-2269(b)(7).

*There is clear and convincing evidence to support the district court's finding that Father lacked effort to adjust to his circumstances, conduct, or conditions to meet the needs of his children.*

A district court may terminate a parent's rights to his or her child if there is clear and convincing evidence of the "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." K.S.A. 2019 Supp. 38-2269(b)(8). This finding is supported by the same evidence that supported the district court's finding that efforts by state agencies failed.

The record shows that Father was not willing to work with DCF or SFCS. The family told DCF that it would work with SFCS but then later refused all services.

9

Similarly, Father's visitations with the children ended because he would not work with SFCS. Although he has been working with SFCS more recently, he still would not initiate contact with it. At the time of the termination hearing, Father had completed some case plan tasks but still did not have a vehicle, had not completed a parenting class, and had not attended a drug and alcohol evaluation, or participated in the treatment.

Father testified that his addiction was the reason he failed to complete the case plan tasks, but he continued to refuse the drug and alcohol evaluation and would not attend treatment. Father testified he would get treatment if he had to, but argued he had "maintained without it."

In addition to Father's failure to complete case plan tasks and attend treatment, Father's SFCS caseworker testified that she had not seen a significant effort by Father to carry out the case plan tasks. As such, the State presented clear and convincing evidence of a lack of effort by Father to adjust his circumstances, conduct, or condition to meet the needs of his children. See K.S.A. 2019 Supp. 38-2269(b)(8).

A district court may terminate a parent's rights to his or her child if there is clear and convincing evidence of a "conviction of a felony and imprisonment." K.S.A. 2019 Supp. 38-2269(b)(5). The district court found that Father had been convicted of a felony and had been imprisoned which is supported by the evidence. At the time of the termination hearing, Father had been released from imprisonment. Thus, his legal status would no longer have served as a barrier to his involvement in the case. However, that does not mean that his legal history has no bearing on the case.

Father was in custody at the inception of the case. He was released, violated his release, and acquired a new charge. The result being that Father was unavailable for a significant part of the case. Father's legal issues were of his own making and poor

10

decision making. A father who was committed to the return of his children would not have put himself in the positions Father did.

While he was in custody, Father made no effort to contact his caseworkers to determine if there were any steps he could take to address his case plan. Classes are often available to those in custody. Even if there were no classes available, making contact would have in some small measure evidenced an interest in the case and the well-being of his children.

Regardless of whether Father's legal status at the time of the termination hearing was grounds for termination, his behavior further evidenced his lack of effort to change his circumstance to meet the needs of his children.

*There is clear and convincing evidence to support the district court's finding that Father failed to maintain regular visitation, contact, or communication with the children.*

A district court may terminate a parent's rights to his or her child if "a child is not in the physical custody of a parent" and there is clear and convincing evidence of the "failure to maintain regular visitation, contact or communication with the child or with the custodian of the child." K.S.A. 2019 Supp. 38-2269(c)(2). The children were placed in the custody of the secretary on January 3, 2018, and have remained in DCF custody throughout the proceedings. As previously mentioned, Father had two visits in March 2018 and one in April 2018. Although a court order prohibited Father from having visitations with the children in the months just prior to the termination proceedings, Father had failed to maintain regular visitation or contact until that point. Furthermore, there is no evidence that Father made any inquiry with his caseworkers to determine what he would have to do to have visits.

The State presented clear and convincing evidence that Father failed to maintain regular visitation, contact, or communication with the children while they were not in the physical custody of a parent. See K.S.A. 2019 Supp. 38-2269(c)(2).

*There is clear and convincing evidence to support the district court's finding that Father failed to carry out a reasonable plan approved by the court directed toward the integration of the children into the parental home.*

A district court may terminate a parent's rights to his or her child if "a child is not in the physical custody of a parent" and there is clear and convincing evidence of the "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home." K.S.A. 2019 Supp. 38-2269(c)(3). Here, the evidence supports such a finding.

The record shows that Father did not begin working on any case plan tasks until he was released from incarceration in March 2019. Since his release, Father has completed some case plan tasks, including:

- Father completed a mental health intake and was participating in individual therapy.
- Father has maintained sobriety for a year and has had clean drug test results since his release from incarceration.
- Father has maintained employment.
- Father participated in budgeting and financial management with SFCS.
- Father maintained housing, but he conceded it was not appropriate for the children because it was too small. Father testified he would move into a bigger house upon regaining custody.
- Father had recently participated in case management with SFCS but only when it reached out to him.

12

That said, Father failed to complete the following case plan tasks:

- Father failed to obtain a driver's license.
- Father failed to obtain reliable transportation.
- Father failed to attend a parenting class.
- Father failed to attend fatherhood initiative classes.
- Father failed to participate in a drug and alcohol evaluation.
- Father failed to follow any recommendations from the drug and alcohol evaluation, including inpatient or outpatient treatment or meetings. Father told his caseworker he was attending treatment but when she followed up with the treatment center, it informed her that he had not been participating.
- Although Father has been sober for one year, he failed to "remain drug and alcohol free at all times" when he tested positive and admitted to using methamphetamine.

As the record shows, Father began completing some case plan tasks after his release from incarceration, but he failed to carry out the totality of the reintegration plan. The most significant of these tasks was to address his drug use which had been an issue since day one of the case. It was not an issue of whether the service was available. It was Father's refusal to follow through. Father testified that he did not think he needed to complete the drug and alcohol evaluation or seek treatment, despite knowing it was part of the case plan tasks. The State presented clear and convincing evidence that Father failed to carry out a reasonable plan directed toward the integration of his children into his home. See K.S.A. 2019 Supp. 38-2269(c)(3).

13

*There is clear and convincing evidence to support the district court's finding that the children have been in the custody of DCF for 15 of the most recent 22 months.*

A district court may terminate a parent's rights to his or her child if there is clear and convincing evidence of

> "whether, as a result of the actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply, the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home." K.S.A. 2019 Supp. 38-2269(b)(9).

It has been established that two factors in subsection (c) of K.S.A. 2019 Supp. 38-2269 apply here. Additionally, at the time of termination, the children had been out of the home and in DCF custody for 19 consecutive months. The children were removed from the home and placed in DCF custody on December 29, 2017. The termination hearing was held on July 25, 2019. This would result in the children being in the custody of the secretary and placed with neither parent for 17 months, beginning 60 days after the date on which the children were removed from their home pursuant to K.S.A. 2019 Supp. 38-2269(b)(9). The State presented clear and convincing evidence that the children had been in the custody of DCF for 15 of the most recent 22 months.

*Father's conduct or condition is unlikely to change in the foreseeable future.*

Having found unfitness, a district court must also determine whether the conduct or condition is unlikely to change in the foreseeable future. K.S.A. 2019 Supp. 38-2269(a).

> "When assessing the foreseeable future, this court uses 'child time' as the measure. The Revised Kansas Code for Care of Children—K.S.A. 2018 Supp. 38-2201 et seq.—recognizes that children experience the passage of time in a way that makes a

14

month or a year seem considerably longer than it would for an adult, and that different perception typically points toward a prompt, permanent disposition. K.S.A. 2018 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings 'in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's')." *In re M.S.*, 56 Kan. App. 2d 1247, 1263-64, 447 P.3d 994 (2019).

Here, the evidence supports the district court's determination that Father's unfitness was unlikely to change in the foreseeable future. Father argues that the district court should have considered the "short amount of time father was not incarcerated leading up to the termination hearing and the progress he made in that short amount of time." At the termination hearing, Father testified that his conduct had changed and that if he were given more time, he would work hard to control his addiction.

Despite showing some efforts on Father's part, the record shows the issues that were present in Father's life at the beginning of the case were still present at the time of the termination hearing. Father still had not attended treatment, Father rarely communicated with SFCS, and he is now the father to another child whom he does not support. The fact that Father was incarcerated and could not complete all the orders was a problem of his own making and should not justify delaying his children permanency. Based on Father's history of making some effort with that effort failing after a short period, he would need a significant period of sobriety and stability to establish his readiness to parent.

These children have been in DCF custody for a significant portion of their lives. A.B. was three years old, M.B. and T.B. were barely two years old, when they were removed from their home. Father's SFCS caseworker testified that she does not believe Father would get more tasks completed if he was given more time. She stated, "I have visited with him several times about the case plan tasks, and he has not worked towards

15

completing some of them." She also testified that the children "would be affected greatly" if the district court were to allow Father more time to complete case plan tasks. She stated,

> "[The kids] are not getting any sense of permanency . . . . They've been going through this for years at this point, and they are not stupid. They know that when I come to their house, you know, what I'm associate with, and I think that they are aware of what's going on. And I think that they should have the opportunity to not have the State involved."

After 19 months, Father still had not addressed his methamphetamine addiction, which was the reason the children were removed from his home initially. This inaction, combined with the testimony of Father's caseworker, supports the district court's finding that Father's unfitness is unlikely to change in the future.

*The district court did not abuse its discretion in finding that termination of Father's parental rights was in the best interests of the children.*

Having found unfitness, the district court must then decide whether termination of parental rights is "in the best interests of the child[, giving] primary consideration to the physical, mental and emotional health of the child." K.S.A. 2019 Supp. 38-2269(g)(1). This decision is within the sound discretion of the district court, and the court makes that decision based on a preponderance of the evidence. An appellate court reviews the district court's decision for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d at 1115-16. A district court exceeds its broad latitude if its ruling is based on an error of law or fact or is "arbitrary, fanciful, or unreasonable." *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 571 U.S. 826 (2013).

Because the facts in the record support the district court's findings, the question then becomes whether no reasonable court would come to the same conclusion. Here, as

16

stated, the evidence shows that Father was in and out of jail, he neglected all contact with the children, he failed to address his addiction to methamphetamine, and he was often uncooperative or refused to communicate with SFCS to complete the required reintegration tasks.

Additionally, the district court concluded it was in the children's best interests to have permanency and considered the "children's behavioral and developmental issues, their need for routine, [and] permanency." This finding is supported by the testimony of A.B.'s teacher and the foster parents, who testified to the aggressive behavior of the children such as hitting, biting, kicking, and acting out frequently. However, the children have been doing well since being given stability in their home. A.B. used to have a maternal relationship with her younger brothers but now has a more traditional sibling relationship. Additionally, M.B. used to be very shy but now will speak to people he does not know and no longer "completely shut[s] down" anytime he is corrected by his foster parents.

The record shows that the children are doing well outside the parental home. Their aggressive behaviors have lessened, and they are developing social skills. The district court did not abuse its discretion when it terminated Father's parental rights to A.B., M.B. and T.B.

Affirmed.

17